WO                                                                              KAB

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Douglas Wayne Derello, Jr.,                    No.  CV 18-03575-PHX-MTL (JFM)

               Plaintiff,

v.                                                                **ORDER**

Unknown Sanchez, et al.,

               Defendants.

      Plaintiff Douglas Wayne Derello, Jr., who is currently confined in Arizona State Prison Complex-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.)  Defendant Harris moves for summary judgment, and Plaintiff opposes.[1]  (Docs. 176, 208.)

**I.      Background**

      In his Complaint, Plaintiff relevantly alleged as follows.  On June 16, 2017, Plaintiff was transferred to the custody of the Arizona Department of Corrections (ADC) and brought four legal boxes, a trash bag full of legal papers, and his cane.  (Doc. 7 at 3.)  An officer told Plaintiff that he would go through the legal materials and return them to Plaintiff, but Sanchez told Plaintiff his property would not be returned.  (*Id.*)  Sanchez then asked Plaintiff if he was still suing the prison and when Plaintiff replied affirmatively, Sanchez stated that in that case, Plaintiff would not get any property.  (*Id.*)  On June 19,

---

      [1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response.  (Doc. 178.)

2017, Plaintiff submitted an inmate letter regarding his property and cane to a correctional officer and Defendant Harris, the property supervisor.  (*Id.* at 4.)  On June 26, Plaintiff told Defendant Harris that he filed a grievance regarding the withholding of his legal property and Harris responded "I will show you what your grievance filing mean[s] to me" and several weeks later, Harris sent Plaintiff a document indicating that his property was being stored.  (*Id.*)

After that, the more Plaintiff requested his legal property "the wors[e his] plight became" and although Plaintiff informed Defendant Doe about the adverse treatment against him, Doe did nothing about it.  (*Id.* at 4-5.)  When Plaintiff was moved to a new unit, he discovered that his property had been inventoried by Defendant Lewis, that his purchased clothing and a lot of his legal materials were missing, and when he returned to his original unit "four days later," he went "through the same problems with Harris [regarding his] legal material."  (*Id.* at 7.)  On November 2, a property officer delivered a lot of Plaintiff's legal documents and told Plaintiff that Harris instructed the officer to give the legal property to Plaintiff and that the officer would try to find Plaintiff's clothes and the rest of his legal work.  (*Id.* at 5.)  On November 7, Sanchez and another officer went to Plaintiff's cell and asked him if he was going to file another grievance against her regarding his property, and when he arrived at the new unit, all the property he received from the property officer was gone.  (*Id.*)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment retaliation claims against Defendants Harris and Sanchez, a failure to supervise claim against Defendant Doe, and an Eighth Amendment medical care claim against Defendant Igwe.  (*Id.* at 8-9.)  The Court dismissed the remaining claims and Defendants.  (*Id.* at 10.)  Thereafter, Defendant Doe was dismissed because Plaintiff did not file a timely notice of substitution, Defendant Sanchez was dismissed for failure to timely effect service of process, and summary judgment was granted in favor of Defendant Igwe.  (Docs. 45, 58, 171.)

. . . .

Defendant Harris argues that he is entitled to summary judgment because there is no evidence that Harris retaliated against Plaintiff.

## II.   Legal Standards

### A.   Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**B.     First Amendment Retaliation**

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a [government] actor took some adverse action against an inmate (2) because of (3) that inmate's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

**III.   Facts[2]**

At all times between June 16, 2017, and November 7, 2017, Plaintiff was in the custody of the ADC. (Doc. 179-1 ¶ 1; Doc. 209 at 3 ¶ 1.) Defendant Sergeant Harris has been employed by the ADC since 2008. (Doc. 179-1 ¶ 2; Doc. 209 at 3 ¶ 2.) Between June 16, 2017 and November 7, 2017, Harris was a Sergeant assigned to the Mail and Property Room at ASPC-Eyman Special Management Unit (SMU). (Doc. 179-1 ¶ 3; Doc. 209 at 3 ¶ 3.)

On or about June 18, 2017, Plaintiff was assigned to housing at Eyman-SMU I East, locator code A38. (Doc. 179-1 ¶ 4; Doc. 209 at 3 ¶ 4.) On or about October 12, 2017, Plaintiff was assigned to housing at Eyman-Cook Unit, locator code A14. (Doc. 179-1 ¶ 5; Doc. 209 at 3 ¶ 5.) On or about October 17, 2017, Plaintiff was assigned to housing at Eyman-SMU Detention, locator code A34. (Doc. 179-1 ¶ 6; Doc. 209 at 3 ¶ 6.) On or about November 1, 2017, Plaintiff was assigned to housing at Eyman-SMU Temp CDU (detention), locator code A67. (Doc. 179-1 ¶ 7; Doc. 209 at 3 ¶ 7.) On or about November 7, 2017, Plaintiff was assigned to housing at Eyman-Rynning Unit (Rynning), locator code

---

[2] Plaintiff claims to dispute some of Defendant's stated facts, but does not state the nature of his dispute in his statement of facts. In some instances, when Plaintiff disputes an asserted fact, Plaintiff cites to certain exhibits. The Court has reviewed the exhibits attached to Plaintiff's controverting statement of facts and is unable to ascertain Plaintiff's disputes. *See generally* Doc. 209. In his Response, Plaintiff does clarify the reasons for disputing certain facts, but his disputes are largely based on his asserted failure to obtain relevant discovery or are based on facts that do not actually dispute Defendant's asserted facts.

A60.  (Doc. 179-1 ¶ 8; Doc. 209 at 3 ¶ 8.)  Plaintiff was assigned to Rynning until he was moved to the ASPC-Florence in January of 2018.  (Doc. 179-1 ¶ 8; Doc. 209 at 3 ¶ 8.)

Between June 16, 2017 through November 7, 2017 Department Order (DO) 909, Inmate Property, governed the ADC's Inmate Property Procedure.  (Doc. 179-1 ¶ 9; Doc. 209 at 3 ¶ 9.)  Pursuant to DO 909, regardless of whether an inmate lives in a cell or dorm setting, an inmate is permitted to keep four "banker" style storage boxes, which are sold in the inmate store, in his immediate living area.  (Doc. 179-1 ¶ 10; Doc. 209 at 4 ¶ 10.)  An inmate is limited to one storage box for "personal" and/or "religious" property and up to three storage boxes for "legal material" and official Department correspondence.  (Doc. 179-1 ¶ 11.)  Boxes that exceed the permissible number permitted in the inmate's immediate living area shall be kept in the Property Department's storage.  (Doc. 179-1 ¶ 11; Doc. 209 at 4 ¶ 11; Doc. 210 ¶ 2.)  If an inmate wishes to obtain access to a box in storage, the inmate submits an Inmate Letter.  (Doc. 179-1 ¶ 11; Doc. 209 at 4 ¶ 11.)  If an inmate already possesses the maximum number of legal boxes permitted in his immediate living area, the inmate must trade out a box from his immediate living area in order to receive a legal box kept in storage.  (Doc. 179-1 ¶ 11; Doc. 209 at 4 ¶ 11.)

A staff member completes an inventory of an inmate's property, using the Inmate Property Inventory, Form 909-4, and when appropriate, the Inmate Property Inventory Supplement, Form 909-1, when the inmate is, among other times, transferred from one institution to another institution, transferred from one unit to a unit of a higher custody level, or is assigned to a temporary placement.  (Doc. 179-1 ¶ 12; Doc. 209 at 4 ¶ 12.)

A staff member at the sending unit or institution packs the inmate's property, including any property in storage.  (Doc. 179-1 ¶ 13; Doc. 209 at 4 ¶ 13.)  Staff members search the inmate's property, looking for contraband, suspicious, or excessive property.  (Doc. 179-1 ¶ 13; Doc. 209 at 4 ¶ 13.)  Officer(s) complete an inventory filling in preprinted areas, where applicable, and provide descriptions for property not already preprinted to include, where applicable, the make, model designation, serial number, color and size, distinguishing marks, signatures, engravings, and visible condition (poor, fair, good),

working condition (W = working, N = new, U = used, NW = not working), and any other identifying characteristics of the inmate's property items.  (Doc. 179-1 ¶ 13; Doc. 209 at 4 ¶ 13.)  Boxes containing legal materials are labeled with the inmate's last name and ADC #, if not already labeled.  (Doc. 179-1 ¶ 13; Doc. 209 at 4 ¶ 13.)  Excess or non-transferrable property is boxed and processed pursuant to DO 909.  (Doc. 179-1 ¶ 13; Doc. 209 at 4 ¶ 13.)  Property that has been inventoried is stored in a secure area until the time of transportation.  (Doc. 179-1 ¶ 13; Doc. 209 at 4 ¶ 13.)

Transporting staff accepts the inmate property files from the sending unit, loads the property, signs for sealed containers, does not accept unsealed or damaged containers, and completes Information Reports (IR), Form 105-2, and delivers the IRs to receiving staff regarding any containers that are lost, opened, or damaged in transit.  (Doc. 179-1 ¶ 14; Doc. 209 at 4 ¶ 14.)  Staff at the receiving institution process inmate property in the order it is received.  (Doc. 179-1 ¶ 15; Doc. 209 at 4 ¶ 15.)  Consequently, when a large number of inmates are received, the length of the queue and an inmate's position in the queue determine the length of time for staff to process that particular inmate's property.  (Doc. 179-1 ¶ 15; Doc. 209 at 4 ¶ 15.)

Receiving staff search incoming property for contraband, excessive property, and property not permitted at the receiving institution due to its increased custody level, e.g., paperclips, staples, binder clips.  (Doc. 179-1 ¶ 16; Doc. 209 at 4 ¶ 16.)  Additional search(es) may be performed by the Special Security Unit (SSU) and/or the Criminal Investigations Unit (CIU).  (Doc. 179-1 ¶ 16; Doc. 209 at 4 ¶ 16.)  Staff document unauthorized property on the Inmate Property Inventory form(s) and Inmate Property/Contraband/Disposition Tracking forms.  (Doc. 179-1 ¶ 16; Doc. 209 at 4 ¶ 16.)

The receiving institution conducts an inventory by cross-checking the inmate's property with the Inventory form(s) and notes this in the "Receiving" column by signing the Officer's initials or noting the status of the property, and notes any irregularities appearing during the inventory in the "comments" section.  (Doc. 179-1 ¶ 17; Doc. 209 at 4 ¶ 17.)  The status of property issued to an inmate may be denoted by an "I," property not

given to an inmate because it is determined to be contraband may be denoted by a "C," property not received by the receiving institution may be denoted by "DNR" (did not receive), and property placed in storage may be noted by the word "stored" or "storage" or something similar.  (Doc. 179-1 ¶ 17; Doc. 209 at 4 ¶ 17.)

According to the Inmate Property Transfer Log (Transfer Log), on June 16, 2017, Plaintiff returned to the ADC with four boxes of property, three (large garbage) bags of property, and a cane.  (Doc. 179-1 ¶ 18.)  According to the Transfer Log, Plaintiff's property arrived on June 16, 2017, and was checked in by staff "AK."  (*Id.*)  The code "AK" does not belong to or identify Defendant Harris.  (*Id.*)  Also, the Transfer Log shows that Plaintiff's property inventory was completed on July 16, 2017, by staff "SMLL."  (*Id.*)  The code "SMLL" does not belong to or identify Defendant Harris.  (*Id.*)

The month prior to Plaintiff's return to the ADC, approximately 128 inmates[3] were transferred to SMU.  (Doc. 179-1 ¶ 19.)  Consequently, during the time period when Plaintiff's property was being processed, the average processing time was four weeks because Plaintiff's property was processed after the 128 inmates who had arrived before him.  (*Id.*)  Staff finished processing Plaintiff's property on or about July 16, 2017, which is exactly four weeks from the date he arrived at the ADC.  (*Id.*)

On June 21, 2017, staff delivered Plaintiff's property that had remained stored at the ADC during the time that he was out to court and in the custody of the Maricopa County Sheriff's Office.  (*Id.* ¶ 20.)  Plaintiff signed the document on June 21, 2017.  (*Id.*)  On July 16, 2017, CO II McCabe created an inventory of some of Plaintiff's property, including four legal boxes and one box of legal paper that were to be kept in storage.  (*Id.* ¶ 21.)[4]  On

---

[3] Plaintiff asserts that only 51 inmates were transferred at that time (Doc. 208 ¶ 5), but Plaintiff's contention does not controvert Defendants' fact that additional inmates were transferred in the month of Plaintiff's transfer.  Moreover, the number of inmates transferred in the month prior to Plaintiff's transfer is not material to deciding the Motion for Summary Judgment.

[4] Plaintiff appears to dispute the contents of the inventory done by McCabe (Doc. 208 ¶ 7), but resolution of this issue is not material to resolving the Motion for Summary

1    July 17, 2017, Plaintiff signed the Inventory form.  (*Id.*)

2         On October 11, 2017, CO II T. Lewis completed an Inmate Property Inventory for

3    Plaintiff.  (*Id.* ¶ 22.)  CO II Lewis worked the Graveyard Shift from 2200 hours (10:00

4    p.m.) to 0600 hours (6:00 a.m.).  (*Id.*)  On October 11, 2017, Defendant Harris worked the

5    Day Shift from 0600 hours (6:00 a.m.) to 1400 hours (2:00 p.m.).  (*Id.*)  Defendant Harris

6    was not at work at the time CO II Lewis performed the Inmate Property Inventory of

7    Plaintiff's property because he left the prison after his shift and before the Graveyard Shift

8    began.  (*Id.*)

9         On October 12, 2017, Plaintiff was moved from SMU to Cook Unit.  (Doc. 179-1

10   ¶ 23; Doc. 209 at 5 ¶ 23.)  The receiving institution checked in Plaintiff's property and

11   noted that the following items were not received: 2 pants (orange); 5 T-shirts (orange); 3

12   boxers (white); 1 sweat pants (orange); 2 shirts; 2 sweaters; and 3 long-sleeve shirts.  (Doc.

13   179-1 ¶ 24.)

14        On October 16, 2017, Officers CO II Moran and Gorman, who worked at the

15   sending institution, Cook, inventoried Plaintiff's property.  (*Id.* ¶ 25.)  The Officers noted

16   that they sent three items that had been kept in storage: 5 storage boxes; 5 expanding files

17   with paper; and 2 plastic expanding files.  (*Id.*)

18        On October 17, 2017, Plaintiff was moved from Cook to SMU.  (Doc. 179-1 ¶ 26;

19   Doc. 209 at 5 ¶ 26.)  At the receiving institution, CO II Garcia checked-in the inventory.

20   (Doc. 179-1 ¶ 27; Doc. 209 at 4 ¶ 27.)  According to the Inmate Property Inventory dated

21   November 16, 2017, the following items were not delivered to Plaintiff, but were

22   determined to be contraband: 5 storage boxes; 5 expanding files with paper; and 2 plastic

23   expanding files.  (Doc. 179-1 ¶ 27; Doc. 209 at 5 ¶ 27.)

24        On November 1, 2017, Plaintiff signed the Inmate Property Inventory forms.  (Doc.

25   179-1 ¶ 28.)  According to the Inventory, no comments were made that any of Plaintiff's

26   property was missing, as required by DO 909, § 909.05, Subsection 1.9 et seq. (*Id.*)[5]

27   _____

28   Judgment.

       [5] Plaintiff asserts that he was not given an opportunity to indicate that anything was

On November 2, 2017, CO II Garcia completed an Inmate Property Inventory Supplement showing that Plaintiff numbered and placed four legal boxes "in long-term legal exchange." (Doc. 179-1 ¶ 29.)[6] On November 2, 2017, Plaintiff signed the Inventory form.  (*Id.*)  Defendant Harris first found out that Plaintiff had filed a lawsuit, Douglas Wayne Derello v. Unknown Jackson, et al., U.S.D.C. CV17-01266-PHX-DGC (JFM), in or about April of 2019 when he was advised by his attorney, Lucy Rand.  (Doc. 179-1 ¶ 30.)

On June 26, 2017, the date Plaintiff claims that Defendant Harris made threatening statements to him in retaliation for his filing *Derello v. Jackson*, Plaintiff had not yet served any defendants.  (*Id.* ¶ 31.)  After Plaintiff's property was prepared and secured for his transport on October 12, 2017, Defendant Harris did not access or cause anyone else to access Plaintiff's property in order to remove any items or for any other reason.  (*Id.* ¶ 32.)  Defendant Harris is unaware of how Plaintiff's property was lost.  (Doc. 179-1 ¶ 33; Doc. 209 ¶ 33.)

Plaintiff asserts that his claimed retaliation is unrelated to *Derello v. Jackson*,[7] but rather that on June 26, 2017, he spoke to Defendant Harris where Defendant Harris asked Plaintiff whether he had talked to Sanchez about his property and stated that Plaintiff was lucky to get any property because "they do not go against their own," apparently in reference to Sanchez not giving Plaintiff his property.  (Doc. 208 ¶ 13.)  Plaintiff states that

---

missing at this time.  (Doc. 208 ¶ 11.)

[6] Plaintiff asserts that these boxes are not relevant to the boxes he was attempting to obtain.  (Doc. 208 ¶ 12.)

[7] Plaintiff also indicates that Harris might have known about *Derello v. Jackson* because documents related to that case were in his property files. (Doc. 208 ¶ 13.) Plaintiff asserts that he does not know whether Harris knew about those files because he did not pursue that line of discovery.  (*Id.*)  Plaintiff's speculation that Harris may have known about his lawsuit is insufficient to create a dispute. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

1    at that time, he told Harris that he had filed grievances about his legal property/cane and

2    that Harris, as the property supervisor, had control over whether Plaintiff received his legal

3    property/cane, and that Harris replied, "I will show you what your grievance filing means

4    to me." (*Id.*)

5        Chapter 7, Section 1.9, Special Needs Orders ("SNOs"), Subsection 1.1, of the

6    Health Services Technical Manual ("HSTM"), revised July 1, 2016, states that

7    "Correctional and Classification staff must be advised of inmate's special needs that may

8    affect housing, work, and program assignments; disciplinary measures; and admissions to

9    and transfers from institutions.  (Doc. 179-1 ¶ 36.)  Such communications must be

10   documented via an approved Special Needs Order form and performed in such a manner

11   that does not compromise confidentiality of health information." (*Id.*)

12       According to Plaintiff's medical record, on June 16, 2017, Plaintiff was seen by

13   Registered Nurse ("RN") Shelby Gillespie for intake and screening and the taking of his

14   vitals.  (Doc. 179-1 ¶ 37; Doc. 209 at 6 ¶ 37.)  According to his medical record, on June

15   17, 2017, Nurse Gillespie saw Plaintiff in response to the initiation of the Incident

16   Command System ("ICS"), a system that advises staff that the allocation of resources, such

17   as staff, is necessary.  (Doc. 179-1 ¶ 38.)  Nurse Gillespie noted in the "Subjective" or "S"

18   area of the medical note that "[Plaintiff] arrived to medical[,] stated he fell asleep with his

19   fit [sic] up in his [wheelchair], and then fell out and hit his head." (*Id.*)  Gillespie further

20   noted that "[Plaintiff] fell asleep without his sleep apnea machine on." (*Id.*)  Under the

21   "Objective" or "O" area, Gillespie noted that "Inmate has small reddened area to the back

22   of his head, no bump, [alert and oriented] x4." (*Id.*)  Under the "Education" or "E" area of

23   the medical note, Nurse Gillespie noted that Plaintiff was educated about "sleep apnea"

24   and "sleeping in [wheelchair]." (*Id.*)  According to his medical record, on June 23, 2017,

25   provider Natalya Weigel, Nurse Practitioner ("NP"), saw Plaintiff and noted that she was

26   "putting SNO in per DOC request." (*Id.* ¶ 39.)  Weigel authorized Plaintiff to possess a

27   quad cane to expire on June 2, 2019.  (*Id.*)  Weigel noted under the "Education" or "E"

28   area of the medical note that "instructions regarding SNO were given to [patient], he

1   verbalized understanding." (*Id.*)  According to his medical record, on July 18, 2017, NP

2   Weigel saw Plaintiff and completed and signed a SNO form for a quad cane, lower bunk,

3   lower tier, wheelchair for long distances, side restraints, CPAP machine, right wright brace,

4   shower chair, and extra blanket, which Plaintiff also signed.  (*Id.* ¶ 40.)

5         Pursuant to the HSTM, Plaintiff's SNO for a quad cane was effective on July 18,

6   2017, when it was documented on an approved SNO form.  (*Id.* ¶ 41.)  From June 16, 2017,

7   through July 18, 2017, Plaintiff did not have a documented SNO to possess a quad cane.

8   (*Id.* ¶ 42.)

9   **IV.   Discussion**

10         Defendant Harris argues that he is entitled to summary judgment because there is

11   no evidence that Defendant Harris retaliated against Plaintiff because there is no evidence

12   that Harris, a non-party to *Derello v. Jackson*  knew that Plaintiff had filed *Derello v.*

13   *Jackson* at the time Plaintiff's property was not given to him, that at the relevant time

14   Plaintiff did not have medical authorization for a cane, and although the medical provider

15   had approved Plaintiff for a cane, the medical provider did not properly complete the

16   paperwork, leaving Plaintiff without the proper paperwork to obtain a cane.  Defendant

17   further argues that there is no evidence that Harris interfered with Plaintiff's receipt of his

18   property, but rather the evidence shows that 128 prisoners were processed at the same time

19   and had to wait to receive their property, that Harris was not involved in the storage of

20   Plaintiff's property on July 17, 2017, and had no involvement with the inventory or storing

21   of Plaintiff's property thereafter.

22         In Response, Plaintiff asserts that Harris, as the supervisor of the property room, had

23   control over whether Plaintiff received his property and on June 26, in response to

24   Plaintiff's statements that he had filed grievances relating to not receiving his property,

25   Harris stated "I will show you what your grievance filing means to me."

26         There is no evidence in this record that Defendant Harris ever took control of

27   Plaintiff's property or acted to delay Plaintiff's receipt of his property.  Plaintiff alleges

28   that Defendant Harris withheld his legal boxes, but does not allege any facts suggesting

that Harris was motivated by Plaintiff's exercise of his First Amendment rights.  Plaintiff asserts that on June 26, 2017, he told Harris about some grievances relating to him not receiving his property and Sanchez not giving Plaintiff his property and Harris said "I will show you what your grievance filing means to me," but the meaning of this statement is not clear; Plaintiff also alleges that later, in July 2017, Harris sent him a document indicating his legal documents had been stored, and that in November 2017, his legal property was given to him at the direction of Defendant Harris, but was later taken by other ADC employees.  Plaintiff also alleged that in November 2017, Harris told him he would try to find the rest of Plaintiff's legal work and clothes.  (Doc. 1 at 9.)

Because there is no evidence that Harris was involved in either withholding Plaintiff's property or destroying it and Plaintiff's allegations are inconsistent with Harris acting in retaliation for Plaintiff filing a grievance or lawsuit, summary judgment will be granted in favor of Defendant Harris.

**IT IS ORDERED:**

(1)   The reference to the Magistrate Judge is withdrawn as to Defendant Harris's Motion for Summary Judgment (Doc. 176).

(2)   Defendant Harris's Motion for Summary Judgment (Doc. 176) is **granted** and the action is terminated.

(3)   The Clerk of the Court must enter Judgment accordingly.

Dated this 15th day of January, 2021.

Michael T. Liburdi
United States District Judge